UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
JESSICA M. GARRETT,                                :
                                                   :
                    Plaintiff,                     :
                                                   :          09 CV 6478 (HB)
          - against -                              :
                                                   :          OPINION & ORDER
MICHAEL J. ASTRUE,                                 :
Commissioner of Social Security                    :
                                                   :
                    Defendant.                     :
------------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:[1]**

  Plaintiff Jessica M. Garrett (hereinafter "Garrett") brings this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision by the Commissioner of Social Security (the "Commissioner") denying her claim for disability benefits. The Defendant, Commissioner Michael J. Astrue (hereinafter "Commissioner") moves for a judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Garrett also moves for a judgment on the pleadings, and argues that her case must be remanded to the SSA for further hearings, because the Administrative Law Judge ("ALJ") who heard her case erred when he failed to employ a vocational expert at Garrett's disability hearing. For the reasons stated below, this Court affirms the Commissioner's decision.

## I. PROCEDURAL HISTORY

  On October 26, 2006 Garrett filed applications for disability benefits and Supplemental Security Income ("SSI") benefit payments.[2] Tr. 75-84. The Social Security Administration ("SSA") denied Garrett's application upon initial review. Tr. 32, 33, 36-51. Following the decision denying benefits, Garrett appealed and a hearing was held before an ALJ, on September 4, 2008. Tr. 17-31, 52-57. On September 26, 2008, the ALJ reviewed Garrett's claim *de novo*, and found that Garrett was not disabled, and was therefore ineligible for benefits. Tr. 8-16. On May 29, 2009, the Appeals Council of the SSA denied Garrett's request for review. Tr. 1-4. On July 20, 2009, Garrett timely filed this action for review of the ALJ's final determination.

---

[1] Syed Ahmad Huda, a second year law student at the University of Pennsylvania Law School, and a summer 2010 intern in my Chambers, provided substantial assistance in researching and drafting this Opinion.
[2] "Tr." citations are to the administrative record.

## II.  FACTUAL BACKGROUND

*Employment History*

According to her testimony before the ALJ and Disability Report (Form SSA-3368), between May 2005 and May 2006 Garrett worked between 5 and 8 hours a day, up to 30 hours a week, as a housekeeper at a retirement home, assembler in a factory, and teacher's assistant at a child care center.  Tr. 29, 113, 129.  She testified that she had bipolar disorder, depression and post-traumatic stress disorder, which existed at least as far back as November 2005 and ultimately caused her to leave work in May 2006.  Tr. 20, 29.  Garrett testified that she remained unemployed until October 2007, at which point she began working at a Deli between 28 and 35 hours per week, which continued through the date of the administrative hearing on September 4, 2008.  Tr. 24-25.

*Medical Evidence – Treating Sources*

On November 3, 2005, Garrett went to Medicus, P.C., a health care facility, and complained that she was feeling depressed.  Tr. 157.  She complained that she suffered from mood swings, lack of appetite and insomnia.  *Id.*  The physician with whom she met noted that she might have bipolar disorder.  *Id.*  On November 4, 2005, she was diagnosed with marked depression.  Tr. 159.  The physician prescribed Wellbutrin, an anti-depressant.  *Id.*  Three weeks later, on November 28, 2005, Garrett went to Medicus to obtain medical clearance to work at the daycare center.  Tr. 154.  Dr. Alex Iwaniw found Garrett to be physically and mentally fit to work at the facility, and accordingly granted her medical clearance.  *Id.*  He found that her depression had improved because of the Wellbutrin she was taking.  Tr. 155.

On March 21, 2006, Garrett visited Family Services, Inc. for an initial intake assessment.[3]  Tr. 173.  According to this intake assessment, Garrett's attention, concentration, orientation and memory were within normal range.  Tr. 175.  The assessment form states that her mood was dysphoric, her affect restricted and guarded, and her speech restricted.[4]  *Id.*  Although her judgment was fair, there were gaps in her insight and her decision-making was described as impulsive.  *Id.*  Based on these symptoms, Lindsey Markel, a mental health care worker,

---

[3] A probation officer had referred Garrett to Family Services, Inc. for the intake assessment after she was convicted of petit larceny and sentenced to three years' probation in August 2005.  Tr 21-22, 173.

[4] Dysphoria is described as "(1) the feeling of being unwell; a vague but troubling discomfort; or (2) a nervous restlessness; the condition of being fidgety."  2D ATTORNEY'S DICTIONARY OF MEDICINE, D-37142 (2009).

diagnosed Garrett with Adjustment Disorder – unspecified.[5]  Tr. 176.  Her Global Assessment Functioning ("GAF") score was 63.[6]  *Id.*

At the same facility, Ms. Hollin Heintz, a nurse practitioner, followed up the initial intake assessment by conducting a psychiatric evaluation of Garrett on May 11, 2006.  Tr. 179.  Heintz found Garrett's affect depressed and her mood dysphoric.  Tr. 181. Heintz diagnosed Garrett with major depressive disorder, post-traumatic stress disorder and avoidant personality disorder.[7]  Tr. 181.  Ms. Heintz prescribed Prozac, and recommended that Garrett return twice a month for evaluation of her regimen of medication.  Tr. 182.  At subsequent appointments, Ms. Markel (Garrett's primary therapist) prescribed Interal, Buspar and Lamictal, drugs used to treat serious disorders.[8]  Tr. 186.

In September 2006, Markel completed a mental health clinic treatment plan for Garrett.  Tr. 183.  According to an assessment in September 2006, Garrett had better attendance, and had begun to focus more on treatment issues.  *Id.*   Garrett was more consistent with medication than she had been earlier.  *Id.*  The primary goal of the treatment plan was to stabilize her mood and to eliminate her symptoms by December 2006.  *Id.*  Another goal was to explore at least three potential employment opportunities.  *Id.*  Ms. Heintz continued to meet with Garrett, and in 2007, Ms. Heintz added Topamax, Xanax, Imipramine and Abilify to Garrett's medication regimen.[9]  Def.'s Mem. of Law at 6; *see* Tr. 231.

---

[5] Adjustment disorder is "the lack of the normal ability to adjust to or cope with an environmental stress (as divorce, illness, a natural disaster, loss of a job) without developing symptoms, such as depression, anxiety, disturbance in behavior, etc.  It is regarded as a mental disorder from which the affected person will recover when the stressful condition ceases to exist."  1-A ATTORNEYS' DICTIONARY OF MEDICINE, A-3092 (2009).

[6] This GAF score is used to assess a person's "psychological, social and occupational functioning." 3-G ATTORNEYS' DICTIONARY OF MEDICINE, G-50067 (2009).  A score ranging from 61-70 implies that the patient has "mild" symptoms of mental illness.  9-65F ATTORNEYS' TEXTBOOK OF MEDICINE 65F.40 (3d ed. 2009).

[7] Major depressive disorder is a "condition marked by the occurrence of one or more major depressive episodes, in the absence of manic or hypomanic episodes." 4-M ATTORNEYS' DICTIONARY OF MEDICINE M-7391 (2009).  Avoidant personality disorder is defined as "a character or personality disorder marked by an aversion for activities that involve relations or contact with other persons, a feeling of discomfort when in the company of people (especially strangers)…" 1-A ATTORNEYS' DICTIONARY OF MEDICINE A-13134 (2009).

[8] Interal is an anti-anxiety drug.  1-A ATTORNEYS' DICTIONARY OF MEDICINE A-8526.  Lamictal is used to treat a form of bipolar disorder.  U.S. Food and Drug Administration, http://www.fda.gov/downloads/Drugs/DrugSafety/UCM152835.pdf (last visited June 21, 2010).  Buspar is used to treat generalized anxiety disorder. 13-106 ATTORNEYS' TEXTBOOK OF MEDICINE (3D ED.) P 106.40.

[9] Topomax is used to treat certain kinds of seizures and migraines.  U.S. Food and Drug Administration http://www.fda.gov/downloads/Drugs/DrugSafety/UCM152837.pdf (last visited Sept. 17, 2010).  Xanax is used to treat anxiety disorders. 6-24 ATTORNEYS' TEXTBOOK OF MEDICINE P 24.130 (3d ed. 2010).  Imipramine is used to treat depression.  12-94 ATTORNEYS' TEXTBOOK OF MEDICINE P 94.20 (3d. 2010).  Abilify is also used to treat depression.  *See* U.S. Food and Drug Administration http://www.fda.gov/downloads/Drugs/DrugSafety/ucm085804.pdf (last visited Sept. 17, 2010).

*Medical Evidence – Non Treating Sources*

On January 9, 2007, Dr. Alex Gindes, a New York State licensed psychologist, evaluated Garrett at the request of the SSA. Tr. 191;. Describing Garrett's mental status, Dr. Gindes found Garrett to be emotionally immature, but cooperative. Tr. 191. He found that her social skills were below adequate levels. In terms of appearance, Dr. Gindes found that Garrett was well-groomed and appropriately dressed. *Id.* Her expressive and receptive language skills were satisfactory. *Id.* She was coherent, and exhibited no symptoms of hallucinations, delusions or paranoia during the evaluation. *Id.* He found her to be anxious and occasionally apathetic, with limited insight and judgment. Tr. 192. Moreover, her recent memory skills were moderately to severely impaired. *Id.*

With respect to Garrett's mode of living, Dr. Gindes found that Garrett was able to dress, bathe and groom herself. *Id.* Garrett said that she cooked, cleaned, did her own laundry, and even managed her finances. *Id.* Dr. Gindes found that Garrett's family and social interactions were limited. She stated that she spent her days at home either crying or sleeping. *Id.*

Dr. Gindes found that Garrett could follow simple instructions independently, but concluded that she was unlikely to succeed in maintaining a regular schedule or performing complex tasks independently. Tr. 193. Dr. Gindes found that Garrett's significant depression, her anxiety and low motivation, and her cognitive deficits were responsible for her health problems. *Id.* As a result, Dr. Gindes found, Garrett was "unlikely to . . . make appropriate decisions, relate adequately with others, or appropriately deal with stress." *Id.* Dr. Gindes diagnosed Garrett with depressive disorder – Not Otherwise Specified ("NOS"); post-traumatic stress disorder; and personality disorder – NOS, accompanied by features of borderline personality disorder. He recommended that she continue her mental health treatment. *Id.*

Finally, Dr. A. Hameed, a state agency medical consultant, conducted a psychiatric review on February 8, 2007. Tr. 195–213. Dr. Hameed found that Garrett had affective disorder, which is characterized by a "disturbance of mood accompanied by a full or partial manic or depressive syndrome." Tr. 198.

Dr. Hameed rated Garrett's limitations by conducting a mental residual functional capacity assessment, which is designed to determine the "most [one] can do despite [his or her] limitations." *See* 20 C.F.R. § 404.1545(a). Dr. Hameed found that Garrett was not significantly limited in 15 out of 20 tested areas. Tr. 209-10. Dr. Hameed determined that Garrett's ability to

concentrate, and to understand and carry out detailed instructions, was moderately limited.  Tr. 209.  She was also moderately limited in her ability to set realistic goals or make plans independently of others.  Tr. 210  Dr. Hameed concluded that "psychiatrically [Garrett] retains the capacity to handle the stress of … work or a job [on] a consistent basis."  Tr. 211.

### III. DISCUSSION

#### A.  Standard of Review

In reviewing a decision of the Commissioner, this Court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." *Santiago v. Barnhart,* 441 F. Supp. 2d 620, 625 (S.D.N.Y. 2006) (quoting 42 U.S.C. § 405(g) (brackets in original)). However, a district court may set aside the "Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)).  Substantial evidence is "more than a scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  This Court is not to substitute its judgment for that of the Commissioner or review the Commissioner's decision *de novo.  See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Alcantara v. Astrue*, 667 F. Supp. 2d 262, 273 (S.D.N.Y. 2009).  While the Commissioner's findings of fact, if supported by substantial evidence, are determinative, an ALJ's incorrect application of the law is a basis for reversal.  *See Vella v. Astrue,* 634 F. Supp. 2d 410, 416 (S.D.N.Y. 2009).

#### B.  SSA Rules and Regulations Governing Disability Determinations

Pursuant to the statute governing disability benefits payments, a person is disabled when he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  In addition, "an individual shall be determined to be under a disability *only if* his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."

42 U.S.C. § 423 (d)(2) (emphasis added).  The SSA has promulgated a five-step procedure to be used by ALJs in evaluating disability claims.  20 C.F.R. §404.1520(a)(4); *see Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam).

## C. Analysis of the ALJ's Decision

Garrett argues that the ALJ failed to adhere to the five-step evaluation procedure because he referred to the "grids" rather than incorporating the opinion of a vocational expert at step four of his disability analysis.[10]  Because Garrett only challenges the ALJ's determination with respect to step four of the analysis, I will address only that issue.

The fourth step requires the ALJ to determine whether the claimant has the residual functional capacity to "perform [her] past work," which entails an evaluation of whether the claimant is capable, in spite of her limitation, of "returning to [her] previous employment." *Rosa*, 168 F.3d at 77.  The ALJ determined that Garrett had the residual functional capacity to perform her past work.  There were no opinions from any of Garrett's treating physicians supporting a greater residual functional capacity than assessed; therefore, the ALJ gave "great weight" to Dr. Hameed, the state agency medical consultant. Tr. 14-15.  The ALJ scoured the record for evidence that Garrett was unable to perform unskilled work, and determined that based on the opinions of Garrett's doctors and Garrett's own work history, she appeared capable of holding a job.  As evidence of Garrett's ability to perform jobs similar to those she previously held, the ALJ analyzed Garrett's work history during the period of alleged disability and noted that although her earnings did not amount to a substantial gainful activity, "the claimant has been able to perform significant work activity essentially on a continuous basis since July 2005."  Tr. 14.  Her jobs during this period include not only her stint as a childcare provider, which had been deemed an unsuccessful work attempt, but also periods as a housekeeper, a factory assembler, and a deli worker.  The last of these jobs required Garrett to operate the store's cash register.  *See* Tr. 15.

Next, to illustrate Garrett's future employment prospects, the ALJ turned to the Directory of Occupational Titles, and discussed the requirements for the jobs of cashier and housekeeper, both positions that Garrett had previously held.  The ALJ concluded that Garrett had no physical limitations that would make such employment impossible or even difficult, and that her mental

---

[10] The "grids" are a series of tables which can lead to automatic findings of disability or nondisability for candidates with a certain combination of age, education, and previous work experience, and are generally employed at step five of the disability determination.

condition did not limit her residual functional capacity in a way that would prevent her from working as a cashier or housekeeper.  Finally, the ALJ buttressed his conclusion by reference to Social Security Ruling 85-15 ("SSR 85-15"), which governs the evaluation of claimants, like Garrett, whose impairments are "non-exertional."  The ALJ found that pursuant to SSR 85-15, Garrett was not disabled, because she had no physical limitations and she could perform a variety of unskilled jobs.  *See* SSR 85-15, 1985 WL 56857 (1985) ("Where there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work.").

Garrett argues that the ALJ misapplied the guidelines of SSR 85-15 because he did not employ a vocational expert at step four.  Pursuant to these guidelines, an ALJ who seeks to determine how a claimant's functional capacity is reduced by the effects of a non-exertional impairment "in many cases…will need to consult a vocational resource."  *Id.*  However, the Second Circuit has made clear that a vocational expert is not required where, as here, the ALJ has already gathered "substantial evidence" to support his determination of the claimant's residual functional capacity.  *Stanton v. Astrue*, 370 Fed. Appx. 231, 235 (2d Cir. 2010); 20 C.F.R. § 404.1560(b)(2) (observing that ALJs "*may* use the services of vocational experts to obtain evidence") (emphasis added).[11]  Given the volume of medical opinions available to the ALJ, and the detailed work history that Garrett provided and upon which the ALJ relied, the opinion of a vocational expert was not required.

Garrett further argues that, having determined that plaintiff had significant non-exertional limitations, the ALJ was obliged to consult a vocational expert.  The Second Circuit recently articulated in *Zabala v. Astrue* that a vocational expert must be consulted where non-exertional limitations "significantly limit the range of work permitted by his exertional limitations."  595 F.3d 402, 410 (2d Cir. 2010) (citing *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)).  However, the rule in *Zabala* is distinguishable for two reasons.  First, *Zabala* was decided in the context of step five of the analysis, whereas the ALJ's analysis in this case ended at step four.  Second, the ALJ's analysis did not find that Garretts's non-exertional limitations "significantly limit[ed]" her ability to work.  To the contrary, the ALJ found that Garrett lacked any impairment significantly limiting her ability to perform work, including work at a high level of

---

[11] According to *Stanton*, "substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." 370 Fed. Appx. at 232 (internal quotation omitted).

7

exertion. A non-exertional limitation "significantly limits" a claimant's range of work when it causes "an additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of meaningful employment opportunity." *Id.* at 411 (quoting *Bapp*, 802 F.2d at 605-06). But in Garrett's case, the ALJ found that she had performed nearly continuous work at several different places of employment during the years of her alleged disability, and gave examples of jobs that Garrett could perform. Thus, the requirement of a vocational expert does not apply here where the ALJ relied on substantial evidence to conclude that Garrett has the residual functional capacity to perform past relevant work or alternative employment.

Finally, Garrett argues that the ALJ should not have cited Medical-Vocational Guideline 204.00, because it "applies only to physical impairments." Pl.'s Mem. Law 5. But the guideline's scope of application is not limited to individuals with physical impairments. In fact, the guideline specifies that individuals will generally not be found disabled if their impairments (whether mental or physical) permit heavy work. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 204.00. The ALJ did not err in referring briefly to the guideline in his step four analysis, wherein he concluded with respect to Garrett that "there are a significant number of…simple, basic, unskilled jobs, *at all exertional levels*, that the claimant can perform, consistent with her young age, 10th grade education and vocational background." Tr. 15 (emphasis added). The ALJ's reference to Rule 204.00 merely serves to describe the level of physical exertion that Garrett was capable of in the employment context. *See Cross v. Astrue*, 2010 WL 2399379 (N.D.N.Y. May 24, 2010) (upholding ALJ's use of Rule 204.00 as a framework for evaluating the disability of a claimant whose impairment was schizophrenia, a non-exertional disorder).

## IV. CONCLUSION

For the foregoing reasons, I conclude that the Commissioner's decision to deny disability benefits to Garrett is supported by substantial evidence. Plaintiff's motion for a judgment on the pleadings is hereby DENIED. Defendant's motion for a judgment on the pleadings is hereby GRANTED. The Clerk of Court is directed to close this case and remove it from my docket.

SO ORDERED

March 11, 2011
New York, New York

Hon. Harold Baer, Jr., U.S.D.J.